# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 7072 | **DATE** | 4/28/2004 |
| **CASE TITLE** | Matrix IV, Inc. Vs. American National Bank & Trust Co. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing set for 6/24/2004 at 10:30 A.M..
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: We remand this case to the Bankruptcy Court for further evidentiary proceedings. Once the Bankruptcy Court has issued an opinion, we will set a briefing schedule should one of the parties indicate that it wishes to appeal the Bankruptcy Court's findings on remand. Once the issue is fully briefed on appeal, we will consider it along with the remainder of the issues presented by the parties on appeal. The in court hearing set for 4/29/04 is stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | APR 2 9 2004 | |
| | Notified counsel by telephone. | | date docketed | 31 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | GMA docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 4/28/2004 date mailed notice | |
| GL courtroom deputy's initials | | Date/time received in central Clerk's Office | GL mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:

S.M. ACQUISITION CO., d/b/a
STYLEMASTER, INC.,

    Debtor.

---

MATRIX IV, INC.,

    Appellant,

v.

AMERICAN NATIONAL BANK AND
TRUST COMPANY OF CHICAGO,

    Appellee.

No. 03 CV 7072

DOCKETED
APR 29 2004

## MEMORANDUM OPINION & ORDER

MARVIN E. ASPEN, District Judge:

    S.M. Acquision Co., d/b/a Stylemaster, Inc. ("Stylemaster") filed a petition for bankruptcy relief under Chapter 11. American National Bank and Trust Company of Chicago (the "Bank") brought a related adversary proceeding against Matrix IV, Inc. ("Matrix") in which the Bank sought a declaration that its lien on certain Stylemaster property was superior to the lien asserted by Matrix. After a bench trial, the United States Bankruptcy Court for the Northern District of Illinois issued its findings of fact and conclusions of law and entered judgment in the Bank's favor. *See In re S.M. Acquisition Co.*, 296 B.R. 452 (Bankr. N.D. Ill. 2003). Matrix now appeals the judgment, as well as the Bankruptcy Court's earlier decision to strike one of Matrix's affirmative defenses. For the reasons set forth below, we remand the action to the Bankruptcy Court for further proceedings on the specific issue of whether

31

Stylemaster owned[1] some of the property at issue in this case. Because we believe this question is central to resolution of the entire dispute (at least with regard to the particular property in question), we refrain from ruling on the remainder of the issues raised by Matrix in its appeal until after the Bankruptcy Court has conducted these further proceedings. We also dismiss as moot Matrix's Motion to Supplement the Record on Appeal, as the proffered documents are relevant to the question of who owned the molds.[2]

## BACKGROUND

The following facts are taken from the Bankruptcy Court's findings of fact and conclusions of law. *See Stylemaster*, 296 B.R. at 456-58. Stylemaster is a company that purchases and sells storage containers that are manufactured using plastic injection molds. The Bank is a creditor of Stylemaster. At the time it filed the present action, Stylemaster owed the Bank over nine million dollars. Matrix, a vendor that manufactured plastic storage containers for Stylemaster using plastic injection molds, is also one of Stylemaster's creditors. Stylemaster currently owes Matrix over six million dollars.

Stylemaster voluntarily filed for bankruptcy protection in 2002. The present dispute centers around efforts made by the Bank and Matrix to recoup some of the money owed to them by Stylemaster. The Bank argues that it is entitled to a first-priority lien on all of Stylemaster's property, including sixty-two plastic injection molds that were purchased by Stylemaster but that are currently held by Matrix. The Bank claims that this lien stems from certain loan and security agreements entered into between the

---

[1] For the purposes of this opinion, we use the term "own" in a particular sense. Rather than associating ownership with title, as is traditionally the case, *see* Black's Law Dictionary 1105 (6th ed. 1990) (defining "own" as having "legal title"), we use the term specifically to mean "rights in the collateral or the power to transfer rights in the collateral to a secured party," which is the standard set forth in Illinois law for assessing whether a party has the right to give another party a security interest in goods. *See* 810 Ill. Comp. Stat. 5/9-203.

[2] Thus, the Bankruptcy Court may itself decide whether or not to allow the proffered documents into evidence on remand.

2

Bank and Stylemaster in which Stylemaster granted the Bank a first priority lien on all of its property (including the molds). The Bank brought this Adversary proceeding before the Bankruptcy Court seeking a declaratory judgment that the Bank is entitled to the molds that are currently being held by Matrix.

Matrix presents several counter-arguments. For the purposes of this opinion, Matrix's important argument is that Stylemaster did not have the authority to give the Bank a lien on some of the molds because Stylemaster lacked sufficient possessory interest to give anyone a security interest in those molds.[3]

The molds in question were ordered by Stylemaster in 1998 and shipped directly from the seller, a company called Cost Reductions, to Matrix's manufacturing plant. Matrix had to "debug" the molds before they could be put into production by setting them up, testing them, and repairing them. Based on the testimony of several witnesses, the Bankruptcy Court found that it was industry practice for the seller (not the buyer) of a new mold to pay for any repair or debugging cost incurred before the mold could be used in production. Accordingly, the Bankruptcy Court determined that Cost Reductions, not Stylemaster, had to pay for the cost of debugging and repair. At trial, Matrix cited to this industry standard as evidence that Stylemaster did not actually obtain title or control over the molds until the

---

[3]Matrix's central argument on appeal, which we refrain from addressing in this opinion, is that it has a first priority tool and die lien on the molds which trumps the lien asserted by the Bank. As Bankruptcy Judge Schmetterer astutely pointed out in his opinion, this argument stands in direct contradiction to Matrix's other argument (addressed here) that Stylemaster did not have the authority to give anyone a lien on certain molds because it did not own them. If, in fact, Stylemaster did not own or have control over the molds, then *neither* Matrix nor the Bank could have obtained a lien on those molds for money owed to them by Stylemaster. Thus, if upon remand Judge Schmetterer decides that Stylemaster did not have rights over the molds in question, then those molds would simply be removed from consideration in the present action. Given this potential result, it is curious that Matrix would argue with such vigor that Stylemaster lacked authority to grant a lien on the molds. Matrix is, however, the master of its own case, and we will therefore address all of the arguments it has raised, whether we believe them to be wise or not.

3

repairs were completed and until Stylemaster specifically "accepted" the molds from their manufacturer.[4] *See* T.R. 1/21/03, p. 55, Testimony of Raymond Wenk ("Debugging isn't complete until the product is accepted by the customer and saying the mold is in good condition and I will pay all balances owed on it."). Because Matrix presumably did not complete the debugging by the time that Stylemaster filed for bankruptcy, Matrix asserted at trial that Stylemaster never accepted the molds, and thus that the molds were still owned by Cost Reductions. If Stylemaster did not own the molds, Matrix concluded, it did not have the power to grant the Bank a lien on those molds.

The Bankruptcy Court disagreed with Matrix's position and concluded that Stylemaster did own the molds, stating that:

> The acceptance that Matrix refers to appears to be nothing more than an industry practice that determines when the cost of repair and debugging of a new mold shifts from the seller to the buyer. There is no evidence that it means anything else. Stylemaster appears to have had complete control over the molds in question, deciding where they should be shipped and how they would be used in production. There is no evidence that Stylemaster was prohibited from using the molds as collateral or that Cost Reductions had any input with regard to the disposition of the molds, other than approval of repair cost that it was required to pay during the debugging phase. Thus, Stylemaster exercised ownership rights in the collateral.

*In re S.M. Acquisition Co.*, 296 B.R. 452, 464 (Bankr. N.D. Ill. 2003). Although the Bankruptcy Court's rationale is sound, it does not provide us with enough information to assess, on appeal, whether the court was legally justified in its conclusion that Stylemaster exercised sufficient ownership rights to give a lien on the property in question.

---

[4]Again, the argument that Cost Reductions owned the molds because they were responsible for debugging costs is completely at odds with Matrix's other contention that Stylemaster owes Matrix money for repairing and debugging costs. However, this is an issue which we will address at a later date, once the Bankruptcy Court has issued further findings.

4

## ANALYSIS

We have two concerns with the Bankruptcy Court's finding that Stylemaster had authority to grant a security interest in the molds. Our first has to do with the applicable burden of proof. It is well-established that "[t]he burden of proving that an item of property is subject to a security interest is on the party asserting the interest." *In re Standard Foundry Prods., Inc.*, 206 B.R. 475, 478 (Bankr. N.D. Ill. 1997). It was therefore the Bank's burden to prove that Stylemaster owned the molds at the time it allegedly conferred a security interest in them to the Bank. We do not believe that the Bankruptcy Court's opinion places sufficient emphasis on this burden with regard to the question of who owned the molds. For example, it emphasized that "[t]here is no evidence that Stylemaster was prohibited from using the molds as collateral or that Cost Reductions had any input with regard to the disposition of the molds..." *In re S.M. Acquisition Co.*, 296 B.R. 452, 464 (Bankr. N.D. Ill. 2003). Citing simply to the *absence* of evidence regarding ownership does not indicate that the Bank fulfilled its burden of showing that it owned the collateral. One of the decisions for our decision to remand, therefore, is for a more complete explanation of how the Bank fulfilled its burden of proof with regard to the issue of ownership.

Our second concern with the Bankruptcy Court's finding is that, although it correctly cited the appropriate statutory law, it did not explain how it applied that law to the facts of the present case or how the evidence produced at trial supported its finding. Illinois law provides that a security interest is only enforceable against the debtor and third parties with respect to an item of collateral if: 1) value has been given for the collateral; 2) "the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party"; and 3) one of several specifically enumerated conditions have been met. 810 Ill. Comp. Stat. 5/9-203. The issue we address here is whether Stylemaster had "rights in the collateral" such that it could transfer a security interest in that collateral to the Bank.

5

The Bankruptcy Court correctly observed that neither the Illinois statute nor the Uniform Commercial Code (which also uses the phrase) defines the phrase "rights in the collateral," but that several courts have interpreted its meaning. *In re S.M. Acquisition Co.*, 296 B.R. 452, 464 (Bankr. N.D. Ill. 2003). The phrase "rights in the collateral" is not synonymous with ownership or title because one may have a valid security interest in property that is not owned by the grantor of the interest. *See Guzell v. Hiller*, 233 F.3d 518, 521 (7th Cir. 2000). Rather, cases interpreting earlier versions of the Illinois Code (which also uses the phrase) have named three ways in which rights in the collateral may be obtained: 1) the debtor may have possession and title to the goods; 2) the true owner consents to the debtor's use of the collateral as security; or 3) the true owner is estopped from denying a security interest. *Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.*, 649 N.E.2d 511 (Ill. App. Ct. 1995). The Bankruptcy Court properly cited this authority, and then went on to conclude that Stylemaster exercised ownership rights in the collateral because it had "complete control" over the molds. However, none of the criterion articulated in *Midwest Decks* suggests that having "complete control" over an item of property alone is sufficient to satisfy the "rights in the collateral" requirement.[5]

---

[5]The facts of this case are not neatly analogous to those of *Midwest Decks* and thus the law announced in *Midwest Decks* is not easy to apply. In both *Midwest Decks* and the subsequent cases that have applied its legal standard, the parties to the case had competing ownership claims to the collateral in question. Here, Cost Reductions is not a party, nor does it claim that *it* owned the molds. Rather, it is Matrix that claims that Cost Reductions owned the molds. This puts us in a rather unique position for which the *Midwest Decks* test is not a neat fit. It is therefore understandable that Judge Schmetterer chose to look to other factors (such as "complete control") in considering whether Stylemaster had rights in the collateral. There is indeed nothing in the text of the *Midwest Decks* case which suggests that the three methods enumerated for establishing rights in the collateral constitutes is an exhaustive list. Indeed, other states have devised other tests in attempting to define "rights in the collateral." *See, e.g., Hong Kong and Shanghai Banking Corp. v. HFH USA Corp.*, 805 F. Supp. 133 (W.D. N.Y. 1992) (applying New York law). However, we have been unable to find any authority in Illinois other than the test announced in *Midwest Decks* from which we could infer that complete control of the collateral is sufficient to constitute rights in the collateral. For this reason, although we are willing to entertain suggestions by the Bankruptcy Court that we should look to other interpretations of that phrase that have been used outside this jurisdiction, we may do so only if the standard used by the Bankruptcy Court is well-articulated and the factual record is developed sufficiently to support the use of such a standard.

Applying *Midwest Decks* to this case, we are without sufficient evidence to conclude as to whether Stylemaster had adequate "rights in the collateral" to transfer a security interest in the molds to the Bank. We address each of the three methods announced in *Midwest Decks* of determining "rights in the collateral" in turn. First, title and possession of an item of collateral are sufficient to constitute "rights in the collateral." Our first question is thus whether Stylemaster had title to and possession of the molds. After examining the Bankruptcy Court's findings of fact as well as the record on appeal, we find that we are without guidance as to whether Stylemaster had title to the molds at the time it gave the Bank its security interest. For example, we do not know if there was a sale agreement between Stylemaster and Cost Reductions which specified when title would pass from one party to the other. *See, e.g.,* 810 Ill. Comp. Stat. 5/2-401(1) ("title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties."). We do not know whether, according to the parties' agreement, the molds could have been rejected by Stylemaster even if they conformed to specifications agreed to by the parties (a so-called "sale on approval"). *See, e.g.,* 810 Ill. Comp. Stat. 5/2-326(2) (providing that "[g]oods held on approval are not subject to the claims of the buyer's creditors until acceptance."). The Bankruptcy Court's opinion is devoid of any mention of the issue of title. We thus find that we do not have enough information to assess whether the Bankruptcy Court believed that Stylemaster had title to the goods at the time it entered into the security agreement with the Bank.[6]

---

We believe that the record is not sufficiently developed on this point for us to do so.

[6]As Matrix points out in its brief, the *Midwest Decks* test requires both title *and possession*. It is undisputed that Stylemaster did not have physical possession of the molds (they were in Matrix's hands). However, possession is not simply physical. Blacks Law Dictionary defines possession as "[h]aving control over a thing with the intent to have and to exercise such control . . . [a] person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons." Black's Law Dictionary 1163 (6th ed.1990); *see also Hong Kong and Shanghai Banking Corp. v. HFH USA Corp.*, 805 F. Supp.

7

The second and third categories listed in *Midwest Decks* test apply only where the debtor lacks title to and possession of the collateral, for both of those categories refer to the "true owner" of the collateral as being someone other than the debtor. In this case, if the Bankruptcy Court were to find that Stylemaster lacked title to and possession of the goods, the "true owner" would be Cost Reductions (the seller of the molds).

As for the second category of *Midwest Decks*, it provides that a person may give a security interest in goods where the "true owner" consents to the use of those goods as collateral. There is nothing in the Bankruptcy Court's findings of fact or opinion which would indicate that Cost Reductions consented to the use of the molds as collateral for Stylemaster's loan from the Bank. Likewise, the third category of *Midwest Decks* states that a person may give a security interest in collateral where the "true owner" is estopped from asserting that it owned the goods. Again, we lack sufficient evidence to assess whether Cost Reductions should be estopped from asserting that it owned the molds. Moreover, to succeed on an estoppel theory, the court must find that "[t]he party asserting the estoppel . . . actually relied on the words or conduct and may not have had knowledge of (or convenient access to) facts contrary to those on which he relied." *In re Pubs, Inc.*, 618 F.2d 432, 438 (7th Cir. 1980). Here, although the Bankruptcy Court never addressed the specific question of whether the Bank relied on representations made by Cost Reductions about ownership of the molds, it did make affirmative findings which suggest that the Bank never even knew that the molds existed. For example, during loan negotiations between Stylemaster and the Bank, the Bank was not informed that Matrix was one of Stylemaster's molders. Similarly, it was not informed that Matrix held some of Stylemaster's molds at

---

133 (W.D. N.Y. 1992) (finding that constructive possession plus title is sufficient to confer "rights in the collateral" where delivery of the collateral is to someone other than the debtor). The Bankruptcy Court made evident its belief that Stylemaster had complete control over the molds and we see no reason to disturb that factual finding. We therefore conclude that, for the purposes of the *Midwest Decks* test, Sytlemaster had "possession" of the molds.

its facility. In fact, Stylemaster warranted that all of its property was housed at four locations, none of which was Matrix's facility. When Stylemaster and the Bank revised the loan agreement in 1997, Stylemaster again failed to list Matrix's facility as a place where collateral was kept. Given this evidence which suggests that the Bank did not know about the molds, it is unlikely that the Bank could persuade the Bankruptcy Court that it believed that Stylemaster owned the molds. Thus, the estoppel portion of the *Midwest Decks* test probably will not apply in this case.

## CONCLUSION

For the foregoing reasons, we remand this case to the Bankruptcy Court for further evidentiary proceedings, if necessary, and for a more specific statement of its reasons for concluding that Stylemaster had sufficient rights in the molds to convey a security interest in them to the Bank. The remand is limited to this purpose. Once the Bankruptcy Court has issued an opinion, we will set a briefing schedule should one of the parties indicate that it wishes to appeal the Bankruptcy Court's findings on remand. Once the issue is fully briefed on appeal, we will consider it along with the remainder of the issues presented by the parties on appeal. It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated 4/28/04