UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| S.M. ACQUISITION CO., d/b/a | ) | |
| STYLEMASTER, INC., | ) | |
| | ) | |
| Debtor, | ) | |
| _____ | ) | No. 03 C 7072 |
| | ) | No. 05 C 1037 |
| MATRIX IV, INC., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN NATIONAL BANK AND | ) | |
| TRUST COMPANY OF CHICAGO, | ) | |
| | ) | |
| Appellee. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

S.M. Acquisition Co., d/b/a Stylemaster, Inc. ("Stylemaster") filed a petition for bankruptcy relief under Chapter 11 on March 18, 2002. American National Bank and Trust Company of Chicago (the "Bank") brought a related adversary proceeding against Matrix IV, Inc. ("Matrix") in which the Bank sought a declaration that its lien on certain Stylemaster property was superior to the lien asserted by Matrix. On August 4, 2003, following a bench trial, the United States Bankruptcy Court for the Northern District of Illinois entered judgment in the Bank's favor. *See In re S.M. Acquisition Co.*, 296 B.R. 452 (Bankr. N.D. Ill. 2003) ("*Stylemaster I*"). Matrix appealed that judgment to our court, as well as the bankruptcy court's earlier decision to strike one of Matrix's affirmative defenses. In an April 29, 2004 Order, we remanded the action to the bankruptcy court on a specific central issue and refrained from ruling on the remainder of the issues raised in that appeal. *See In re S.M. Acquisition Co.*, No. 03 C 7072, 2004 WL 1151575 (N.D. Ill. April 29, 2004) ("*Stylemaster II*"). On January 13, 2005, the

bankruptcy court issued additional findings of fact and conclusions of law supporting its original judgment in the Bank's favor. *See In re S.M. Acquisition Co.*, 319 B.R. 553 (Bankr. N.D. Ill. 2005) (*"Stylemaster III"*).

Matrix appeals the bankruptcy court's findings and conclusions upon the remand. For the reasons stated below, we affirm the original and additional findings and conclusions of the bankruptcy court and the challenged evidentiary and discovery rulings, and remand the case to the bankruptcy court for the limited purpose of entering its memorandum opinion and order on Matrix's equitable subordination defense.

## BACKGROUND[1]

### I.        Introduction

Stylemaster is a company that purchases and sells storage containers that are manufactured using plastic injection molds. *Stylemaster I*, 296 B.R. at 456, Finding of Fact ("FOF") ¶ 1.[2] The Bank is a creditor of Stylemaster. FOF ¶ 3. At the time it filed the present action, Stylemaster owed the Bank over $9.5 million. *Id.* Matrix, a vendor that manufactured plastic storage containers for Stylemaster using plastic injection molds, is also one of Stylemaster's creditors. FOF ¶ 4. Stylemaster currently owes Matrix over six million dollars. FOF ¶ 5. Stylemaster voluntarily filed for bankruptcy protection in March 2002. FOF ¶ 2. As of March 2002, Matrix was in possession of sixty-two plastic injection molds, which it had used to produce plastic products for Stylemaster. FOF ¶ 4. The present dispute concerns whether the Bank or Matrix is now entitled to these sixty-two molds.

---

[1]The following facts are taken from the bankruptcy court's original and additional findings of fact. *See Stylemaster I*, 296 B.R. at 456-63; *Stylemaster III*, 319 B.R. at 555-63.

[2]All subsequent references to Findings of Fact from the bankruptcy court's August 4, 2003 opinion, *Stylemaster I*, 296 B.R. 452, will be cited as "FOF" followed by paragraph number.

## II.     The Sixty-Two Molds in Matrix's Possession

The sixty-two molds in question were ordered by Stylemaster and shipped directly from the seller to Matrix's manufacturing plant.  FOF ¶¶ 35-36.  Of these sixty-two molds, Stylemaster purchased twenty-one of these molds (the "Bankruptcy Molds") from Plastic Products Estate, a Chapter 11 Debtor **in Possession, at a public sale.  *Stylemaster III*, 319 B.R. at 556, Additional Findings of Fact ("AFOF") ¶¶ 70-72.**[3]  As of May 12, 1994, Stylemaster had title to each of the twenty-one Bankruptcy Molds pursuant to a Bill of Sale executed by David Anderson, a representative of Plastic Products Estate.  AFOF ¶ 73.

During the years 1998, 1999, and 2000, Stylemaster ordered thirty-three molds from mold broker Cost Reductions Company (the "Cost Reductions Molds").  AFOF ¶ 74.  Cost Reductions contracted with Portuguese mold manufacturers to build molds for its customers in the United States and has supplied molds to Stylemaster since 1991.  AFOF ¶ 75.  Martha Williams, the president of Stylemaster, was responsible for purchasing molds for Stylemaster.  AFOF ¶ 76.  To purchase molds from Cost Reductions, Williams would contact Barry Tanner of Cost Reductions to discuss specifications, product design, etc., and submit drawings and other documents pertaining to design.  AFOF ¶¶ 78-79.  Cost Reductions would send Stylemaster a quotation, and if Williams found it acceptable, she would send a signed purchase order to Cost Reductions.  AFOF ¶¶ 80-81.  Prior to 2000, the purchase order forms used by Styelmaster contained certain terms and conditions with language giving the buyer a right to return merchandise that was not according to specifications and which stated that all goods were subject to approval before acceptance.  AFOF ¶ 86.  Beginning in 2000, Stylemaster began using computer-generated purchase order forms that did not contain these terms and conditions.  AFOF ¶¶ 87-89.

---

[3]All subsequent references to Additional Findings of Fact from the bankruptcy court's January 13, 2005 opinion, *Stylemaster II*, 319 B.R. 553, will be cited as "AFOF" followed by the paragraph number.

During the manufacturing process for a mold, it was "sampled" by the mold maker, meaning that it was run to determine whether it would produce an acceptable product. AFOF ¶ 92. A number of samples were run on each mold during the manufacturing process, and samples were sent to Stylemaster for review, evaluation, and approval. AFOF ¶ 93. Williams was responsible for approving the final samples run from molds, after which the mold was approved and shipped. AFOF ¶¶ 93-95. Tanner testified that delivery matured Stylemaster's payment obligation to Cost Reductions, which Stylemaster paid in monthly installments. AFOF ¶ 97.

In 2001, Stylemaster ordered eight molds[4] (the "CME Molds") from Chicago Mold Engineering Co. ("CME"), a mold manufacturer that operates out of Chicago, Illinois. AFOF ¶¶ 98-99. Stylemaster's ordering process with CME was substantially similar to its process with Cost Reductions. AFOF ¶ 100. Stylemaster's sampling process for CME molds, however, was different from that with Cost Reductions because CME did not have the capacity to run samples. AFOF ¶ 102. Consequently, Matrix ran the samples for CME molds and shipped the molds back to CME during various phases of the manufacturing process. AFOF ¶¶ 102-03. Stylemaster paid for CME molds on a payment schedule and was fully paid by December 2001. AFOF ¶ 104.

After shipment, Stylemaster insured and recorded each mold on its balance sheet. AFOF ¶ 126. Many of the molds had the Stylemaster logo engraved onto them. AFOF ¶ 127. Matrix produced over nine million plastic products from the molds after July 25, 2001 and was producing products as late as February 2002. AFOF ¶ 124, 128.

---

[4]The bankruptcy court's additional findings of fact contain some inconsistencies regarding the number of molds at issue. Although there are a total of sixty-two molds, only sixty-one molds are identified by reference to how they were supplied to Stylemaster – twenty-one Bankruptcy Molds, thirty-three Cost Reductions Molds, and seven CME Molds. See AFOF ¶¶ 69, 70, 74, 98. Our review of the exhibits indicates that there were in fact twenty-one Bankruptcy Molds, thirty-three Cost Reductions Molds, and eight CME Molds.

## III.     Stylemaster's Dealings with the Bank

On November 3, 1997, the Bank and Stylemaster entered into a loan agreement and a security agreement.  FOF ¶¶ 6-7.  The Loan Agreement indicated that the loan was secured by " . . . all Accounts, Inventory, Equipment owned by [Stylemaster] as of the date hereof . . . and any and all other assets and property of [Stylemaster], wherever located . . . ."  FOF ¶ 38.  The Security Agreement also provided that Stylemaster granted the Bank a security interest in "all of the Borrower's tangible and intangible assets and property, whether now or hereafter existing and whether now or hereafter owned . . . including, without limitation, all of Borrower's . . . equipment . . . and inventory."  FOF ¶ 45.  When William Bailes, an officer and co-owner of Stylemaster, applied to the Bank for a loan for Stylemaster, he indicated in the loan application that Stylemaster's molding was done by outside third-party suppliers who possessed and utilized Stylemaster's molds.  FOF ¶¶ 38, 40.  Among other obligations provided by the Security Agreement, Stylemaster warranted that the collateral securing the loan was located at four specific locations in Illinois, which did not include Matrix or its Woodstock, Illinois facility.  FOF ¶¶ 47-50.  Within the Loan Agreement, neither paragraph 7.2 nor paragraph 5.13, both of which concerned the location of the secured collateral, mention the Matrix Woodstock facility.  FOF ¶¶ 52-54.  On November 6, 1997, Bank filed a Uniform Commercial Code ("U.C.C.") financing statement with the Illinois Secretary of State, which stated that the Bank asserted a security interest in all of Stylemaster's then existing and any after-acquired property.  FOF ¶ 10, 63.

Between 1997 and 2001, the Loan Agreements and related documents between Stylemaster and Bank were amended, including on November 30, 2001, when Stylemaster and Bank entered into the "Seventh Amendment to Loan Documents."  FOF ¶ 9, 64.  This amendment substituted into the Security Agreement the following language: "Borrower, . . . hereby grants the Bank a security interest in . . . Borrower's tangible and intangible assets and property <u>wherever located</u>."  FOF ¶ 64 (emphasis added).

## IV. Stylemaster's Dealings with Matrix

From November 1994 until shortly before Stylemaster filed its bankruptcy petition, Stylemaster used Matrix as an outside processor to manufacture plastic containers using plastic injection molds. FOF ¶ 12. Matrix had to "set-up" and "debug" the molds before they could be put into production by setting them up, testing them, and repairing them. FOF ¶¶ 26, 35; AFOF ¶¶ 107, 108. Prior to this litigation, Matrix never billed Stylemaster for set-up costs, nor did Matrix keep any records documenting these costs. FOF ¶ 27. At trial, Matrix asserted payment for set-up costs, which were computed in preparation for trial by Matrix employee John Wenzlaff based on Tool Room Profiles generated from employee time slips. FOF ¶ 28. The bankruptcy court found many problems with these calculations, including that Wenzlaff's methodology for determining significant repair costs versus routine maintenance was questionable; the Tool Room profiles for the 1994-1996 period were not created until 2002; a significant portion of the charges sought were not supported by any time slip and tool logs provided no information about the amount of time spent working on a particular tool; many exhibits for the costs contained duplicate billings; charges were assigned to the wrong mold or did not specify any mold; Matrix seeks an amount equal to 30% of repair costs for "profit" that was derived solely based on what Raymond Wenk, president of Matrix, thought was fair; and Matrix never kept a running tally of its repair charges, nor included receivables, nor issued invoices related to sought repair costs. FOF ¶¶ 28-34.

Regarding debugging costs, the bankruptcy court found that it was industry practice for the seller of a new mold to pay for debugging cost incurred before the mold could be used in production. FOF ¶ 35. Accordingly, the bankruptcy court determined that Cost Reductions, not Stylemaster, had to pay for the cost of debugging and repair, and that Cost Reductions had in fact paid most of the $80,000 in costs that Matrix billed Cost Reductions. FOF ¶ 36-37.

In 1994, Matrix received two sets of molds from Stylemaster that had to be repaired before they

could be used in production.  FOF ¶ 19.  Matrix obtained approval from Stylemaster before commencing repairs, and the cost of the repairs was invoiced to Stylemaster, which paid the invoices.  FOF ¶ 21.

Wenk testified that during mid-1995 Williams asked him to defer the cost of repairs made by Matrix to Stylemaster molds.  FOF ¶ 23.  Under the purported agreement, Matrix would have complete control over the Stylemaster molds until Stylemaster paid all outstanding repair bills, and the molds would be treated as if they were owned by Matrix.  *Id.* Stylemaster could not remove any molds until the repair bills were paid in full, and Matrix would keep a record of the accumulated repair costs.  *Id.* Because this purported agreement to defer repair cost was never documented and there were many inconsistencies and errors in the evidence on the repairs, the bankruptcy court found Wenk's testimony on this agreement not credible.  *Id.*

In 1996, Matrix and Stylemaster entered an agreement whereby Matrix would include the cost of minor repairs in the unit price Matrix charged Stylemaster for producing each plastic container item.   FOF ¶ 24.  However, any extraordinary repairs were to be paid by Stylemaster, subject to the requirement that such repairs must be pre-approved by a principal at Stylemaster.  *Id.*  Stylemaster has paid all such repair bills invoiced by Matrix.  FOF ¶ 25.

In 1999, a line of molds designed by Williams called the Contempra Line experienced significant problems when put into production and required substantial repairs.  AFOF ¶ 111.  Matrix, the mold manufacturers, and an outside contractor all performed various repairs to the molds.  AFOF ¶¶ 114, 116, 119.  Both Cost Reductions and Stylemaster paid for repairs made to molds.  AFOF ¶¶ 114, 116, 118, 122, 123.  Despite these problems, Stylemaster fully paid for the Contempra Line molds and was able to produce millions of plastic products from these molds.  AFOF ¶¶ 120, 121, 123.

On July 30, 1996, counsel for Matrix sent a letter to Martha Williams in which Matrix notified Stylemaster that it was asserting a tool and die lien on the Stylemaster molds in its possession.  FOF ¶

16.     As of November 6, 1997, Stylemaster owed Matrix approximately $2.4 million for processing work. FOF ¶ 13, 66. However, by the end of December 1999, Stylemaster had fully satisfied its pre-November 6, 1997 debt to Matrix. *Id.* Stylemaster continued to owe Matrix for work performed after that date. On February 22, 2002, Matrix filed a complaint against Stylemaster and Martha Williams. FOF ¶ 17. During March 2002, Matrix filed a proof of secured claim under the Illinois Tool and Die Act for approximately $6.6 million, and during the same month, Stylemaster filed for bankruptcy. FOF ¶ 5.

## V.     Procedural History

At an adversary proceeding before the bankruptcy court, the Bank sought a declaratory judgment that it was entitled to a first-priority lien on all of Stylemaster's property, including the sixty-two plastic injection molds that were purchased by Stylemaster and are currently held by Matrix. The Bank claimed that this lien stems from the loan and security agreements entered into between the Bank and Stylemaster in which Stylemaster granted the Bank a first priority lien on all of its property. Matrix presented several counter-arguments. First, Matrix argued that Stylemaster did not have the authority to give the Bank a lien on the molds because Stylemaster lacked sufficient possessory interest to give anyone a security interest in those molds. Second, Matrix argued that it had tool and die and artisan's liens on the molds which trump the lien asserted by the Bank. Following the bench trial, the bankruptcy court entered judgment in favor of the Bank. *See Stylemaster I*, 296 B.R. at 474. Thereafter, Matrix appealed, arguing that the bankruptcy court erred when it concluded that 1) Stylemaster could and did grant the Bank a security interest in the molds; 2) Matrix's tool and die lien was trumped by the Bank's lien; 3) Matrix did not have an artisan's lien on the molds. Matrix also appealed the bankruptcy court's decision to strike its eight affirmative defense based upon equitable subordination.

In an April 28, 2004 Order, we remanded this adversary proceeding to the bankruptcy court for further evidentiary proceedings, if necessary, and for a more specific statement of its reasons for

concluding that Stylemaster had sufficient rights in the molds, which was central to the issue of whether Stylemaster could grant the Bank a security interest in the molds. *Stylemaster II*, 2004 WL 1151575, at *4. We reserved decision on the remaining issues of the appeal until after the bankruptcy court had issued its findings on the remanded issue. *Id.* In July and August of 2004, the bankruptcy court conducted proceedings on the remanded issue, and on January 13, 2005, the bankruptcy court issued additional findings of fact and conclusions of law supporting its decision that Stylemaster had sufficient rights in the molds at issue to convey a security interest in them. *See Stylemaster III*, 319 B.R. 553. Matrix now appeals the bankruptcy court's findings of fact and conclusions of law on the remanded issue, as well as several discovery and evidentiary rulings made upon the remand. We now address this appeal as well as the remainder of the issues presented by the parties on the original appeal.

## STANDARD OF REVIEW

In a bankruptcy appeal, we examine findings of fact for clear error, accepting the bankruptcy court's version of the facts unless "[we are] left with the definite and firm conviction that a mistake has been committed." *In the Matter of Sheridan,* 57 F.3d 627, 633 (7th Cir.1995) (internal citations omitted). As the Seventh Circuit has explained, to be clearly erroneous, " 'a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week old, unrefrigerated dead fish.' " *Piraino v. Int'l Orientation Res., Inc.,* 137 F.3d 987, 990 (7th Cir. 1998) (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.,* 866 F.2d 228, 233 (7th Cir. 1988)). Furthermore, when findings of fact are based on determinations of witness credibility, the deference accorded the bankruptcy judge is even more significant. *Id.*

We review questions of law and mixed questions of fact and law under a *de novo* standard. *See Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004). *De novo* review requires that we make an

independent examination of the bankruptcy court's judgment without giving deference to that court's analysis or conclusions. Rulings by the bankruptcy court on discovery and evidentiary matters are reviewed for abuse of discretion. *Miksis v. Howard*, 106 F.3d 754, 758 (7th Cir. 1997).

## ANALYSIS

I.      **Stylemaster's Rights in the Molds**

        A.      **Discovery and Evidentiary Rulings on the Remand**

Matrix first appeals several of the bankruptcy court's discovery and evidentiary rulings on the remand, arguing that the bankruptcy court erred when it: 1) failed to compel Cost Reductions to produce documents relating to the purchase and making of new molds; 2) admitted the Bank's selective but incomplete evidence of ownership which was available but intentionally withheld prior to August 2004; 3) barred Matrix's discovery requests, reopened exhibits and the testimony and proffers of Loretta Lane, Ray Wenk, and Larry Scales; 4) improperly questioned witnesses and improperly ignored and dismissed uncontested evidence that contradicted its January 2005 and August 2003 Orders. We review these decisions for abuse of discretion. *Miksis*, 106 F.3d at 758.

Matrix's first argument on appeal is that the bankruptcy court erred in reopening proofs on Stylemaster's acceptance of and title to the sixty-two molds at issue in this case. According to Matrix, a reopening of the evidence is not proper where the insufficiency reflects a party's unexplained and unexcused failure to satisfy its burden of proof, and the bankruptcy court violated the remand order and Illinois law when it reopened proofs without requiring the Bank to show any evidentiary insufficiency. Matrix believes that any insufficiency in the record was a result of the Bank's tactical decision in proving its ownership claims during the original trial, and, therefore, the reopening was improper.

Nothing offered by Matrix establishes that the bankruptcy court abused its discretion by

reopening the evidence. In our April 29, 2004 Order, we explained that the existing record and the bankruptcy court's opinion did not provide us with enough information and explanation on the "rights in the collateral" requirement necessary to the conclusion that Stylemaster could grant the Bank a security interest in the molds. *Stylemaster II*, 2004 WL 1151575, at *2. The bankruptcy court had concluded that Stylemaster's "complete control" over the molds was sufficient to meet the rights in the collateral requirement, a factor that appeared to be different than those enumerated in *Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.*, 649 N.E.2d 511 (Ill. App. Ct. 1995), the case which announced the primary test for determining "rights in collateral." *Stylemaster I*, 296 B.R. at 464.

We explained that there is considerable ambiguity in the law on determining whether an entity has sufficient "rights in the collateral" and that the unique circumstances in this case made it particularly understandable that the bankruptcy court had looked to factors outside of *Midwest Decks*, such as "complete control," and we left it to the bankruptcy court to provide us with further explanation and support of the "complete control" test and/or to provide us with further information to assess whether its determination fit within the *Midwest Decks* test. *Stylemaster II*, 2004 WL 1151575, at *3 n.5, *4. In both our remand order and our order clarifying the remand order, we specifically provided that the bankruptcy court would have discretion to reopen the evidence, if necessary, for a more complete explanation of its conclusion regarding Stylemaster's "rights in the collateral" regarding the molds. *Stylemaster II*, 2004 WL 1151575, at *4 ("[W]e remand this case to the Bankruptcy Court for further evidentiary proceedings, if necessary, . . . ."); *Matrix IV, Inc. v. Am. Nat'l Bank*, 03 C 7072 (N.D. Ill. July 16, 2004) ("[W]e will make our intent as plain as possible: upon remand, the Bankruptcy Court has discretion to reopen evidence if it determines it must do so to comply with our remand order.").

As the Seventh Circuit has recognized, "[i]n a case in which the state of the record precludes a just decision, the record should be reopened and additional evidence taken." *In re Taxman Clothing Co.*,

905 F.2d 166, 1717 (7th Cir. 1990). Upon the remand, the bankruptcy court felt it necessary to reopen the evidence in order to determine whether the Bank had established "rights in the collateral" under the one of the factors enumerated in *Midwest Decks*, and specifically its first test which requires title and possession. *See Stylemaster III*, 319 B.R. at 564. It appears that the bankruptcy court took this route as an alternative to providing additional explanation or evidence on the "complete control" test upon which it found in its original order that the Bank had established Stylemaster's "rights in the collateral." This was proper given our remand order and the law. The bankruptcy court did not abuse its discretion in reopening evidence on the remand, nor did it abuse its discretion in the manner in which it reopened evidence.

During the course of the remand, the bankruptcy court made several evidentiary rulings which Matrix now appeals. First, the court denied Matrix's subpoena for the specifications to the molds at issue. (*See* Transcript of Proceedings Before the Honorable Jack B. Schmetterer ("Tr.") 8/12/04 at 54.) Secondly, the court excluded the testimony to be offered by Matrix regarding non-payment of processing invoices due Matrix, opinions as to ownership, opinions on Matrix's alleged molder's lien, or trade and uses as to what constitutes acceptance or title passage. (*See* Tr. 8/12/04 at 72-74; Tr. 8/16/04 at 41-42.) Finally, the court barred Matrix from copying or introducing documents from CME's "job files" which would presumably provide evidence as to whether the molds at issue met specifications. (*See* Tr. 8/20/04 at 5-12, 19-22.) Matrix also argues that the bankruptcy court improperly controlled witness questioning, referring to two instances in which the court's questioning "was intended and did in fact deflect counsel's cross-examination and dilute the witnesses' admissions." (Appellant's 3/9/2005 Brief at 47.) We review the propriety of judicial questioning of a witness for abuse of discretion. *Kapelanksi v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004).

Matrix does not show how each of these rulings and actions was an abuse of discretion, but

rather, it urges that the entire series of rulings and conduct by the bankruptcy court wrongfully precluded Matrix from responding to the Bank's theory of ownership and presenting its own theory of ownership. According to Matrix, the bankruptcy court's rulings and actions on the remand were tied to its misconception about the issue of acceptance and how this related to the remanded issue of rights in the collateral.

After a careful review of the record, we find that the bankruptcy court did not abuse its discretion in issuing the challenged evidentiary rulings and conducting some witness questioning. The court's decision on August 12, 2004 to quash a Matrix subpoena was based upon the supportable finding that the subpoena was overbroad, and lacked value, weight, and pertinence to the limited subject of the remand. (Tr. 8/12/04 at 54.) The court's bases for its remaining evidentiary exclusions were 1) to limit the evidence to only the remanded issue, which was whether Stylemaster had adequate "rights in the collateral" to grant a security interest, and 2) to prevent witnesses from testifying to legal opinions, which are the province of the court. The record indicates that the excluded evidence Matrix sought to introduce was relevant only to the issue of lien priority, which is beyond the scope of the mandate, or was testimony as to the beliefs and practices about when title passes, which is a properly excluded legal opinion. Contrary to Matrix's argument, the bankruptcy court understood the scope of the remand and its evidentiary decisions were not an abuse of discretion.

Finally, the record shows that in the few instances in which the court questioned witnesses, it did so not to "deflect counsel's cross-examination and dilute witnesses' admissions," but rather, to clarify counsel's confusing compound question in one instance, and to clarify testimony that was resulting from counsel's hypothetical questioning about a particular mold in the other instance. (Tr. 8/23/04 at 28-30, 71-72.) In both instances, counsel was allowed to continue his line of questioning after the court had finished asking its few questions. For these reasons, we do not find that these instances of judicial

questioning were an abuse of discretion.

### B.    Bankruptcy Court's Additional Findings and Conclusions

Turning now to the substance of the remand, Illinois law provides that a security interest is only enforceable if: (1) value has been given for the collateral; (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and (3) either the debtor has executed a security agreement describing the collateral, or the collateral is not a certificated security and it is in possession of the secured party pursuant to the security agreement.  810 Ill. Comp. Stat. 5/9-203 (2004). On remand, only the second element regarding whether the debtor had "rights in the collateral" was at issue.  *Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.* announced three ways in which "rights in the collateral" may be obtained: (1) the debtor may have possession and title to the goods; (2) the true owner consents to the debtor's use of the collateral as security; or (3) the true owner is estopped from denying a security interest.  649 N.E.2d at 516.  We observed in our April 29, 2004 opinion that the bankruptcy court's conclusion that Stylemaster had rights in the collateral based upon its "complete control" over the molds did not fall neatly within the *Midwest Decks* criteria, and on remand, we left it to the bankruptcy court to determine whether to articulate support for using its "complete control" standard or to apply the *Midwest Decks* standard.  *Stylemaster II*, 2004 WL 1151575, at *3-4.  The bankruptcy court chose to apply *Midwest Decks*, and after proceedings on the issue, it concluded that the Bank had established Stylemaster's rights in the molds based upon *Midwest Decks*' "possession and title" factor.  *Stylemaster III*, 319 B.R. at 569.

Matrix appeals the bankruptcy court's additional findings and conclusions that Stylemaster had sufficient rights in the molds to grant the Bank a security interest in them, and it presents three primary objections: (1) the bankruptcy court failed to articulate its complete control test and any application of this test violates Illinois law; (2) the Bank has failed to prove that Stylemaster had "possession" of each

of the molds and, therefore, cannot meet its burden under *Midwest Decks*; (3) the bankruptcy court erred in concluding that Stylemaster had title to each of the forty-two new molds purchased from Cost Reductions and CME.[5]

## 1. Complete Control Test

With respect to the complete control test, Matrix's argument seems to be that the bankruptcy court failed to articulate a standard or support for this test as it was supposed to under our remand order, and without such articulation and support, there is no basis upon which to support Stylemaster's rights in the collateral for the molds. As we explained above, however, our remand order allowed the bankruptcy court to either explain and support its complete control standard or apply the *Midwest Decks* standard to this case in determining whether Stylemaster's "rights in the collateral" existed. It is clear from the bankruptcy court's additional findings of fact and conclusions of law that it chose the latter option. Its decision to take this course rather than proceed with the complete control test was proper.

## 2. Possession

Proceeding under *Midwest Decks*, the bankruptcy court concluded that Stylemaster had rights in the sixty-two molds because it had both possession and title to the molds. Matrix now argues that the bankruptcy court erred because the Bank did not prove possession. We previously recognized that the bankruptcy court's findings on complete control supported a finding of Stylemaster's possession of the

---

[5]Matrix has also raised several arguments in this new appeal regarding the priority of its alleged liens vis-a-vis the Bank over the mold, including the Bankruptcy Molds, supposedly because the bankruptcy court made new conclusions after the remand about lien priority. Contrary to Matrix's belief, the bankruptcy court did not make any new findings or conclusions on lien priority in its January 13, 2005 opinion. The single reference the bankruptcy court made to a "first priority lien," *see Stylemaster III*, 319 B.R. at 569, was simply a reiteration of its conclusions from August 3, 2003 opinion. Therefore, we will disregard the new arguments that Matrix makes about lien priority in this second appeal because the lien priority issue is outside the scope of the remand. We will, however, address Matrix's prior arguments regarding lien priority, which were properly made in connection with its first appeal, later in this opinion.

molds, and we do not see any reason to revisit that decision. *See Stylemaster II*, 2004 WL 1151575, at *3 n.6 ("The Bankruptcy Court made evident its belief that Stylemaster had complete control over the molds and we see no reason to disturb that factual finding. We therefore conclude that, for the purposes of the *Midwest Decks* test, Stylemaster had "possession" of the molds.) ; *see also In re Standard Foundry Prods., Inc.*, 206 B.R. 475, 479 (Bankr. N. D. Ill. 1997) (holding that rights in collateral cannot be based upon "mere possession" alone, but rather, courts should look to rights of ownership and control in the collateral.) Therefore, we reject Matrix's new arguments that the Bank did not prove possession of the molds.

### 3.     Title

The focus of the additional findings and conclusions in the bankruptcy court's January 13, 2005 opinion was on the title over the molds, and specifically, title through acceptance. Matrix argues that the bankruptcy court erred when it found that the Bank carried its burden of proving that Stylemaster had title to the Cost Reductions and CME Molds, together referred to as the "New Molds." The bankruptcy court found that Stylemaster had formed a valid sales contract providing for the purchase of each of the New Molds and concluded that title to the molds had passed from the respective mold vendors to Stylemaster upon the approval of a final product sample. *Stylemaster III*, 319 B.R. at 567. Matrix argues that the bankruptcy court erred in making this conclusion because the agreements between Stylemaster and the mold vendors were "sale on approval" transactions in which title does not pass to the buyer until he "accepts" the goods, and that there was no acceptance of the molds in this case.

Under the Uniform Commercial Code ("U.C.C."), as adopted in Illinois, acceptance of goods occurs when the buyer "(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or (b) fails to make an effective rejection . . . , but such acceptance does not occur until the buyer has had a

reasonable opportunity to inspect them; or (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him." 810 Ill. Comp. Stat. 5/2-606 (2004). The U.C.C. also provides the buyer of goods with an opportunity revoke its acceptance, but such revocation "must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it." 810 Ill. Comp. Stat. 5/2-608 (2004).

The bankruptcy court found that it was unclear whether all of the Cost Reduction and CME molds were "sale on approval" transactions,[6] but concluded that even assuming *arguendo* that they were, Stylemaster had accepted all of the molds in issue, and therefore, title for each of these molds passed from the mold vendors to Stylemaster. *Stylemaster III*, 319 B.R. at 566. Significant to the bankruptcy court's decision were the findings that: 1) All parties to the contracts testified that their understanding was that a mold was accepted after approval of a final sample; 2) Despite knowledge of defects in the molds, some of which were apparent at the moment of delivery and some of which were known once the molds were put into production, Stylemaster chose to retain and use them to manufacture large numbers of products; 3) Matrix did not establish that it was Stylemaster's agent to report when a mold was acceptable, and therefore, the bankruptcy court rejected Matrix's contention that there was no acceptance because Matrix never reported any molds as acceptable; 4) There was no evidence of notification to CME or Cost Reductions of Stylemaster's intent to reject the molds; 5) In the few instances in which Stylemaster did return molds to mold vendors, it did so only for repairs or adjustments and after repairs

---

[6]The provisions in Stylemaster's purchase orders with CME and Cost Reductions, which suggested that the transactions were sales on approval were not contained in the new purchase order forms used by Stylemaster after 2000. Therefore, the bankruptcy court concluded that with respect to molds purchased after 2000, which includes seven CME Molds and twelve Cost Reduction Molds, not all of them would have been sales on approval.

were completed, the molds were returned for further use in large scale production; 6) Stylemaster's conduct with respect to the molds was in accordance with its ownership of the molds, including marketing and accepting orders for products produced by the molds, insuring and recording each mold on its balance sheet, and engraving its own logo on many of the molds; 7) After Cost Reductions and CME completed performance under their contracts with Stylemaster, they did not assert any rights or interests in the molds. *See id.* The bankruptcy court concluded that this history indicated Stylemaster's conduct was entirely inconsistent with the sellers' continued ownership of the molds and that Stylemaster had lost its right to revoke acceptance by its exercise of ownership over the molds. *See id.* at 569. Accordingly, Stylemaster accepted the molds upon approval of a final sample and had title to them. Matrix appeals the bankruptcy court's acceptance conclusion arguing that the conclusion is premised upon a misconstruction of the burden of proof and upon factually and legally erroneous propositions.

Matrix first argues that the bankruptcy court erroneously put the burden of proof on Matrix to prove its agency and to negate Stylemaster's acceptance of the molds. However, there is nothing in the bankruptcy court's additional findings and conclusions that suggests that it placed the burden on Matrix to show non-acceptance of the molds. In fact, the bankruptcy court's analysis makes evident its conclusion that the Bank's evidence showing acceptance of the molds carried more weight than Matrix's evidence towards non-acceptance, and therefore, that the Bank met its burden of proof. *See id.* at 567. Nor did the bankruptcy court's conclusion on the agency issue shift the burden of proof to Matrix as to acceptance. Rather, its opinion simply explained why Matrix's agency theory, which supposedly gave it the authority to accept or reject molds on Stylemaster's behalf, was not supported by the evidence and did not rebut the considerable other evidence in the record which indicated that Stylemaster did in fact accept the molds. *See id.* at 568.

Next, Matrix argues that some of the bankruptcy court's findings and conclusions upon which

the order is premised are erroneous. Specifically, Matrix disputes the bankruptcy court's finding that no new molds were ever returned to the mold vendors, *see* AFOF ¶ 126, and conclusion that the defects in the molds were minor, fully known, and accepted by Stylemaster, *Stylemaster III*, 319 B.R. at 567, 569. To dispute these findings, Matrix points to testimony that the 2000 Contempra Line molds were returned to Cost Reductions and that problems in that same line did not surface until several months after delivery. Contrary to Matrix's characterization, the bankruptcy court did not erroneously find that no new molds were ever returned to mold vendors and that the defects were minor, fully known, and accepted by Stylemaster. Indeed, the bankruptcy court made a finding that acknowledged that the 2000 Contempra Line molds were returned to Cost Reductions for repairs. AFOF ¶ 123. The bankruptcy court further found that after repair, the Contempra molds were returned to Matrix for production, and accepted and paid for by Stylemaster, supporting a conclusion that the return was not a rejection of Stylemaster's ownership of the molds. AFOF ¶¶ 120-123.

The bankruptcy court also acknowledged that several of the problems with the molds were major defects, including "missing parts," AFOF ¶ 109, and "significant problems" in certain molds requiring "substantial repair," AFOF ¶ 111, and that sometimes defects were not known until after a mold was put into production, *Stylemaster III*, 319 B.R. at 567. The bankruptcy court concluded that despite having to return some molds for repairs, and despite finding major and minor defects in the molds sometimes at delivery and sometimes not until later, Stylemaster never rejected or permanently returned any of the molds to Cost Reductions or CME. Based upon the record, we do not find the bankruptcy court's findings and conclusions on this to be erroneous.

On this issue, Matrix also emphasizes of the testimony of Martha Williams, the president of Stylemaster, in which she states that had she been aware of the problems with the Contempra Molds at delivery, she would have returned the molds to the manufacturer. This hypothetical possibility that

Williams would have returned a defective mold to a manufacturer does not provide insight as to whether Stylemaster *did* actually reject molds, and in fact, further testimony indicated that the mold in question was not returned but was used in production. (*See* Tr. 8/23/04 at 72.) Furthermore, even if Williams would have actually returned the Contempra Molds at the time of delivery because of knowledge of the defects, her testimony indicates that the return would have been for the purpose of repairing the molds and not as a permanent rejection of the molds. (*See* Tr. 8/23/04 at 71.)[7] This is what indeed happened later with respect to the Contempra Molds, when the line was sent back to Cost Reductions for repairs, and then returned to Matrix for Stylemaster's production. The bankruptcy court found that this conduct did not indicate that Stylemaster had rejected the molds, and we see no error in that finding.

Next, Matrix argues that the bankruptcy court erred by concluding that the shipment of molds prior to their inspection constitutes acceptance. According to Matrix, acceptance could not occur until an inspection showed that the molds could be put to their intended use, something that was done for the New Molds only by Matrix after delivery. Contrary to Matrix's representation, the bankruptcy court did not find that shipment before inspection constituted acceptance. Rather, it found that Stylemaster's normal practice in inspecting the use of the molds was in approving final samples of products produced from them. *Stylemaster III*, 319 B.R. at 567. It rejected Matrix's argument that only Matrix could inspect the molds prior to acceptance, finding instead that Stylemaster was responsible for making the decision of whether a mold was acceptable, and that its practice was to do so on the basis of final samples produced and not inspection of the mold itself. *Id.* Based upon the record, the bankruptcy court's findings and conclusions on this issue are not erroneous.

Next, Matrix states that the bankruptcy court ignored evidence that Matrix and Stylemaster were

---

[7]Williams testified, "Well, if I had been running these molds myself in my shop and there was this type of problem, I simply would have returned these molds back to Cost Reduction. There would be no more debugging or anything else. It's just fix it and give me my mold back."

forced to use the molds to fill orders for presold products, and use of goods in such cases of economic necessity does not constitute acceptance.  In a similar vein, Matrix argues that the use of goods in cases while the seller is attempting to cure defects does not constitute acceptance.  Even assuming that the use of goods in circumstances involving a repair period or economic necessity cannot alone constitute acceptance *per se*, in this case the bankruptcy court <u>did not</u> rely solely on the use of the molds to conclude that Stylemaster had accepted them.  Rather, the court looked at a host of facts that showed the parties' conduct was consistent with Stylemaster's acceptance of the molds, including not only its use of the equipment to produce millions of products, but also the many salient facts previously described in this opinion.  These included, among other things, that per its usual practice, Stylemaster approved a final sample product produced by each of the CME and Cost Reductions molds; Stylemaster insured and recorded each mold on its balance sheet; Stylemaster had its logo engraved on many of the molds; neither of the mold vendors asserted any right or interest in the molds; and Stylemaster never rejected, returned, or asked for any refund relating to any of the molds despite its knowledge of some problems with the molds over a significant period of time.[8]

Matrix also argues that the bankruptcy court's conclusion that acceptance of sample products constituted an acceptance of the respective mold is erroneous.  To this end, Matrix states that there was no evidentiary basis for the court's conclusion that all parties testified that their understanding was that

---

[8]It is also important to acknowledge that unlike the cases cited by Matrix in support of these propositions, Stylemaster did not at any point give notice of its intent to reject the molds, nor does it now assert that it intended to reject the molds.  *See, e.g., CPC Int'l, Inc. v. Techni-Chem*, 660 F. Supp. 1509, 1514 (N.D. Ill. 1987); *Sierra Diesel Injection Serv. v. Burroughs Corp., Inc.*, 651 F. Supp. 1371, 1378 (D. Nev. 1987); *Hollingsworth v. The Software House, Inc.*, 513 N.E.2d 1372, 1377 (Oh. App. 1986); *Can-Key Indus., Inc. v. Indus. Leasing Corp.*, 593 P.2d 1125, 1130-31 (Or. 1979). It is therefore likely that this law is inapplicable to this case.

We further observe that the bankruptcy court did not find that Stylemaster was forced to begin using the molds to avoid "economic ruin," as suggested by Matrix, and Matrix's citations to the record do not support such a finding.  Therefore, it is unclear whether the economic necessity circumstance would even apply here.

a mold was accepted when a final sample was approved and that in fact available evidence of the parties'
understanding of when title passed was barred and never offered. Matrix misconstrues the bankruptcy
court's opinion in this regard. The bankruptcy court did bar testimony about parties' understanding of
when title passed on the basis that such evidence would amount to improper legal and subjective opinions
about a legal question that is to be decided by the bankruptcy court. The bankruptcy court's decision to
bar such testimony was not an abuse of discretion. On the basis of properly considered evidence,
including testimony by the parties about their conduct and procedures in handling molds, including the
shipment of molds after approval of a final sample product which matured Stylemaster's payment
obligations for the molds, the bankruptcy court concluded that the parties' understanding was that a mold
was accepted after approval of a final sample, and therefore, it was at that point that title passed. *See*
AFOF ¶¶ 90-97. The bankruptcy court's conclusion regarding acceptance of molds upon approval of
a final sample product was more than adequately supported by the evidence, and therefore, we do not
find it to be in error. (*See* Tr. 8/19/04 107-109; Pl.'s Reopened Ex. 65, Tanner Dep. at 8-15.)

Finally, Matrix argues that the Bank did not prove that Cost Reductions had good title to molds
and therefore has not shown Stylemaster ever received good title to the Cost Reductions molds. The
bankruptcy court found on the basis of Barry Tanner's undisputed testimony that each Cost Reductions
mold was purchased by Cost Reductions from a Portuguese manufacturer with a general purchase order
form and delivered per Stylemaster's instructions after Cost Reductions and Stylemaster were satisfied
that each such mold produced acceptable samples. *See* AFOF ¶¶ 74-97. Accordingly, title passed to
Cost Reductions when it took physical delivery of the molds through its U.S. customs broker and
evidenced its acceptance to the Portuguese manufacturers. *See* 810 Ill. Comp. Stat. 5/2-401 (2004) (title
is presumed to pass upon delivery). The bankruptcy court's findings on this issue are not erroneous, and
its conclusion that Cost Reductions passed good title to Stylemaster is sound.

## II.     Lien Claims and Priority of Liens

Having addressed Matrix's appeal of the bankruptcy court's January 13, 2005 opinion on the remanded issue of Stylemaster's rights in the molds, we return now to the remainder of Matrix's appeal of the bankruptcy court's August 4, 2003 opinion.  Matrix challenges the bankruptcy court's findings and conclusions regarding the existence of the Bank's U.C.C. lien in the sixty-two molds, Matrix's asserted tool and die, general processing, and artisan's liens, and the priority of the Bank's lien vis-a-vis Matrix's liens.

### A.     The Bank's U.C.C. Lien

Matrix argues that the bankruptcy court erred when it determined that Stylemaster granted a security interest to the Bank.  According to Matrix, the 1997 Loan and Security Agreements between Stylemaster and the Bank "plainly manifest the Bank's intent that the Secured Collateral" would not include the Stylemaster property held at Matrix, i.e. the sixty-two molds at issue in this case. (Appellant's 12/24/03 Corrected Brief at 19.)  Its argument stems from the fact that the Security Agreement, which granted the Bank a security interest in "all of [Stylemaster's] tangible and intangible assets and property, whether now or hereafter existing and whether now or hereafter owned, . . . including without limitation . . . goods . . . equipment," did not include the term "wherever located" even though the inclusion of that language was contemplated in drafts of the Security Agreement.  According to Matrix, this omission, considered along with paragraph 5.13 of the Loan Agreement, which provided that the collateral would be kept at designated locations and did not list Matrix's facility, indicates that the sixty-two molds at Matrix's facility were intended to be excluded from the Bank's security interest.

As the bankruptcy court correctly recognized, however, the scope of a party's security interest is determined by the security agreement, not the loan agreement.  *In re Martin Grinding & Mach. Works*, 42 B.R. 888, 891 (Bankr. N.D. Ill. 1984); *Allis-Chalmers Corp. v. Staggs*, 453 N.E.2d 145, 148 (Ill. App.

1983).  Here, the Security Agreement granted the Bank a security interest in "all of [Stylemaster's] tangible and intangible assets and property," including "equipment."  It was proper for the bankruptcy court to conclude that this language, even without the "wherever located" clause, evidenced an intent by the parties to grant the Bank a blanket lien on all of Stylemaster's assets, including the sixty-two molds at issue in this case.[9]

Although this analysis of the loan documents was sufficient in itself to support its conclusion, the bankruptcy court's conclusion was further bolstered by parole evidence of the parties' intent in forming the Security Agreement.  Both Bailes and Provan, who respectively represented Stylemaster and the Bank in the transaction, testified that consistent with the all-inclusive language in the Security Agreement, they intended for the Bank to have a blanket lien in all of Stylemaster's property.  (*See* Tr. 1/13/03 (Excerpt B) at 76, 80; Tr. 1/23/03 (Excerpt A) at 17.)  Contrary to Matrix's contention, this testimony was admissible.  *See Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir. 1988) (intent of a party to a contract is relevant if it is shared with the other party to the agreement and is consistent with the ordinary meaning of the agreement).  The bankruptcy court's conclusion that the Bank held a lien in the sixty-two Stylemaster molds was not erroneous.

### B.    Matrix's Statutory Tool and Die Lien

Matrix argues that the bankruptcy court erred when it decided that the Bank's U.C.C. lien in the molds trumped Matrix's tool and die lien.  Matrix argues that the bankruptcy court's decision in this regard was erroneous for a number of reasons; however, the crux of its argument boils down to its disagreement with the bankruptcy court as to the meaning of the Illinois Tool and Die Lien Act ("ITDLA"), 770 Ill. Comp. Stat. 105/1.  Based upon the statutory language, as construed by reference

---

[9]Furthermore, as the bankruptcy court observed, even if the Loan Agreement is considered, paragraph 5.13 merely reflects Stylemaster's promise to keep the collateral at certain designated locations, and does not limit the scope of the Bank's security interest.

to certain principles of statutory construction and the common law on possessory liens, the bankruptcy court concluded that a lien arising under the ITDLA is specific, meaning that it attaches to the specific tool or die and corresponds to a specific debt. *See Stylemaster I*, 296 B.R. at 468-71. The bankruptcy court held that Matrix had a lien that arose under the ITDLA for processing work done for Stylemaster, but any claim for processing work done before November 1997 was extinguished in 1999, when, as stipulated, Stylemaster fully paid for all pre-November 1997 processing work. *Id.* at 469. Once Matrix's lien claim for pre-November 1997 debt was extinguished in 1999, the Bank's lien, which arose in November 1997, achieved priority over Matrix's claim for processing work done after November 1997. *Id.*

Matrix urges that a lien under the ITDLA is "general," giving the molder a blanket lien over all of the debtor's property in possession until all existing and future debts are extinguished. Matrix makes several arguments on appeal: 1) The bankruptcy court erred in its reading of the statutory language; 2) The bankruptcy court erred when it interpreted the ITDLA by reference to the common law repairman's lien rather than the common law general processing lien; 3) Matrix's first priority lien was never extinguished because Stylemaster never fully paid its obligations to it. As discussed more fully below, we agree with the bankruptcy court's interpretation of the ITDLA. We also agree that Matrix held a specific tool and die lien that was extinguished with respect to pre-November 1997 processing work when those debts were paid, and was inferior to the Bank's perfected U.C.C. lien with respect to post-November 1997 processing work.

The ITDLA provides:

§ 1. Lien. Plastic or metal processors or persons conducting a plastic or metal processing business shall have a lien in the tools, dies, molds, jigs, fixtures, forms or patterns in their possession belonging to a customer, for the balance due them from such customer for plastic or metal processing work, and for all materials related to such work. The processor may retain possession of the tool, die, mold, jig, fixture, form or pattern until such balance is paid, subject only to a security interest properly perfected pursuant to

Article 9 of the Uniform Commercial Code. 770 Ill. Comp. Stat. 105/1.

The bankruptcy court found that the language in this statute grants the processor a specific lien that is tied to the particular tool, die, mold, etc., and is limited to payment for the processing work done. Matrix argues that the Act grants a blanket lien in all of a customer's production-related property possessed by the molder until the full balance owed to the processor is paid. Matrix emphasizes the use of the plural terms, "tools, dies, molds . . . ," and reference to "balance due" and "for all materials related" to such work in the first sentence in support of its position. We agree with the bankruptcy court's interpretation and reject Matrix's interpretation. As the bankruptcy court observed, Matrix's reading violates the maxim that the court must attempt to give meaning to every word of a statute. *Young v. Brashears*, 560 F.2d 1337, 1345 (7th Cir. 1977). Matrix's interpretation of the statute makes the first clause of the second sentence redundant, whereas the bankruptcy court's interpretation gives the phrase meaning in identifying that the possessory lien is tied to "<u>the</u> tool, die, mold, etc." that gave rise to the debt, which exists until "<u>such</u> balance is paid," meaning the balance related to processing work created from the particular tool, die, or mold.[10]

We also find that the bankruptcy court's reference to common law principles such as the common law artisan's lien to inform its interpretation of the ITDLA and support its meaning based on the plain language was proper. It is well-established that a statutory lien that is declaratory of the common law must be interpreted in conformity with common law principles. 51 Am. Jur. 2d Liens, § 55 (2005). A

---

[10]Matrix also references the Illinois Repairman's Lien, 770 Ill. Comp. Stat. 45/1, as support for its "plain language" interpretation in favor of a general lien. That statute states that "[e]very person, form or corporation who has expended labor, skill or materials upon any chattel, . . . shall have a lien upon such chattel . . . for the contract price for all such expenditure of labor, skill or materials . . . ." According to Matrix, this shows that when the Illinois legislature intended to restate a common law specific lien it did so, and the specific lien language in this statute is "pointedly missing" from the ITDLA. For the reasons stated above, we agree with the bankruptcy court that the Illinois legislature <u>did</u> use such specific lien language in the ITDLA.

statute will be given its common law meaning unless there is clear evidence in the statute itself that the legislature intended otherwise or the statute cannot possibly be reconciled with the common law. *City of Chicago v. Nielsen*, 349 N.E.2d 532, 538 (Ill. App. Ct. 1976); *Reeves v. Eckles*, 222 N.E.2d 530, 531 (Ill. App. Ct. 1966); 51 Am. Jur. 2d Liens, § 55. In this case, there is nothing in the ITDLA which suggests that the Illinois legislature intended to expand the possessory artisan's lien, the common law predecessor for the ITDLA lien. As the extent of the common law artisan's lien was limited to the work actually performed on the chattel in the artisan's possession, a possessory tool and die lien under the ITDLA is similarly limited to the work actually performed on the tool or die in the processor's possession. Importantly, this interpretation is also in accord with the principle that "the lien which the law favors is a specific or particular lien, and general liens are not favored but are discountenanced as encroachments on the common law and are to be strictly construed . . . ." *Deitchman v. Korach*, 71 N.E.2d 367, 369 (Ill. App. 1947); *see also Oxxford Clothes XX, Inc. v. Expeditors Int'l of Wash.*, No. 94 C 7734, 1995 WL 408193, at *6 (N.D. Ill. 1995). Furthermore, although the common law did recognize general possessory liens, these were limited to specific classes of relationships, which do not include that described by the ITDLA. *See* Restatement of Security § 62 (in the absence of contract or statute, general possessory liens are restricted to factors, attorneys, and bankers).

Matrix argues that the bankruptcy court should have looked instead to the common law "general processing lien" to inform its construction of the ITDLA. However, none of Matrix's cited authorities indicate that Illinois has ever recognized such a lien, and furthermore, the authorities that Matrix has cited do not support a general processing lien in other jurisdictions. First, Matrix states that Minnesota law has "long recognized" a common law general processing lien, and it cites the 1951 Minnesota case *Braufman v. Hart Publications, Inc.* 48 N.W.2d 546 (Minn. 1951). However, *Braufman* stands only for the proposition that a processor to whom goods have been delivered under a single contract for services

to be performed upon them has a lien upon all the goods for the value of the services under the contract, i.e. the "single contract rule." *See id.* at 551.[11] Matrix also cites a Minnesota statute regarding possessory liens over molds and patterns, *see* Minn. St. § 514.18(1) and 514.19(3)*,* but that statute provides no indication of whether it is general or specific.

Matrix also cites an Indiana statute and an Indiana bankruptcy case as support for its purported common law general processing lien. *See* Ind. St. § 26-1-9.1-333, Comments; *In re Stookey's Holsteins, Inc.*, 112 B.R. 942, 948-49 (Bankr. N.D. Ind. 1990). Matrix quotes the comments from the Indiana statute that "the common law gave an artisan a possessory lien upon goods for the cost of services rendered by the artisan in repairing, processing or manufacturing goods," and that this lien is "usually but not always general." (Appellant's 12/24/03 Corrected Brief at 24-25.) This language is not found in the official comments to the cited statute. Similarly, the Indiana bankruptcy case *In re Stookey Holsteins* does not support its position. That case does not discuss the difference between a general lien versus a specific lien, nor does it make reference to any common law which grants a general lien over all of the debtor's property in a processor's possession. In sum, none of these authorities state or even suggest that there was a general processing lien of the type asserted by Matrix in the common law.

Matrix also argues that Illinois case precedent on the ITDLA and an artisan lien statute in Iowa support its interpretation of the ITDLA. However, Matrix's cited Illinois case, *Plasti-world*, *Ltd. v. Burgundy Products Manufacturing*, stands merely for the proposition that a lien arises under the Act at the time work is performed, and not when notice is given. No. 98 C 4348, 1999 WL 1270714, at *6

---

[11]Although not mentioning *Braufman* specifically, the bankruptcy court in fact provided a detailed explanation of the single-contract rule for possessory liens and why it did not apply here. *Stylemaster I*, 296 B.R. at 468 n.3, 469. The bankruptcy court found that Matrix did not receive the sixty-two molds under a single contract, nor was the processing work performed pursuant to a single contract or a requirements contract. *Id.* at 469. The bankruptcy court's finding that Matrix operated under multiple contracts, rather than a single contract, with Stylemaster was not erroneous, and we thereby find the *Braufman* case and the common law single-contract rule to be inapplicable.

(N.D. Ill. Dec. 29, 1999) (disagreeing with *Affiliated Bank v. Evans Tool & Mfg. Co.*, 593 N.E.2d 145, 147 (Ill. App. Ct. 1992)). This has little to do with the issue we face here. To the extent that it is relevant, the holding in *Plasti-world* actually supports the bankruptcy court's interpretation of the ITDLA because it holds that a lien attaches when the work or service is performed upon a good in possession, which suggests a specific, not general, lien. 1999 WL 1270714, at *6. Matrix also cites the Iowa case *Chemical Bank v. Communications Data Services, Inc.,* which interprets the artisan's lien provision in the Iowa U.C.C., in support of its general lien theory. 765 F. Supp. 1401 (S.D. Iowa 1991). For the same reasons stated by the bankruptcy court in its August 4, 2003 opinion, we disagree with the court's analysis in *Chemical Bank. See Stylemaster I*, 296 B.R. at 469-70.

Finally, Matrix argues that once its ITDLA lien attached to the molds, it was not extinguished until all of Stylemaster's obligations were paid, and since Stylemaster never brought the balance owed to Stylemaster down to zero, it continued to hold a first priority lien. However, this argument is completely at odds with the strong presumption in favor of specific liens and Seventh Circuit authority on the nature of liens as related to claims. As the bankruptcy court recognized, under Seventh Circuit law, a lien attaches only to specific chattel under a particular bailment. *Stylemaster I*, 296 B.R. at 469 (citing *Unisys Fin. Corp. v. Resolution Trust Corp.*, 979 F.2d 609, 611 (7th Cir. 1992)). "A lien is parasitic on a claim. If the claim disappears – poof! The lien is gone." *Unisys Fin. Corp.*, 979 F.2d at 611. Matrix lost its pre-November 1997 claims when they were fully paid, and therefore any liens associated with those claims were extinguished.

### C.     Matrix's Trade Usage and Contract Based Tool and Die Liens

Matrix argues that the bankruptcy court erred "when it failed to consider but concluded that Matrix's trade usage and contract based general processing liens were inferior to the Bank's lien."

(**Appellant's 12/24/03 Corrected Brief at 31.**)  The Bank argues that Matrix did not assert "trade usage and contract based tool and die liens" prior to its appeal, and, therefore, Matrix has waived any such claim.  It also argues that even if Matrix had not waived these theories, it failed to present any evidence to support recovery under them.

We agree with the Bank that Matrix has waived its claims based on theories of trade usage or contract based tool and die liens.  Matrix's citations to the record which show "uncontroverted" evidence of such liens does not provide any such evidence of trade usage or contract based liens.  (*Id.* at 32.)  Rather, those citations reflect evidence that was directed to the issue of Matrix's asserted statutory tool and die lien under the ITDLA.  (*See id.* at 4, ¶¶ 3-4.)  For example, Matrix cites to its trial exhibits 7, 8, and 12, all of which explicitly deal with Matrix's assertion and provision of notice to Stylemaster of a lien under the ITDLA.  Matrix's citations to the testimony at trial similarly concern Matrix's ITDLA lien, not a "trade usage" or "contract based" tool and die lien.  (*See id.*)  Furthermore, these theories do not appear in Matrix's answer and affirmative defenses or in Matrix's proposed findings of fact and conclusions of law.

Matrix contends that it did disclose these "trade usage" and "contract based" tool and die lien theories, citing its pleadings on summary judgment, its equitable subordination defense, the joint pre-trial order, and its post-trial findings of facts.  (*See* Appellant's 3/2/04 Reply Brief at 7.)  We have reviewed each of the citations, and Matrix's assertion in these briefs was limited to its theory of a tool and die lien under the ITDLA.  In fact, each of the cited sections of the pleadings discusses the ITDLA statute explicitly by citation to its name and number.  *See* Record On Appeal ("ROA") 17 (Matrix's Statement of Additional Undisputed Facts in support of its Response and Objection to the Motion for Summary Judgment) at ¶¶ 4, 7; ROA 44 (Matrix's More Definite Statement of Facts in Support of its Equitable Subordination Defense) at ¶ 2; ROA 107 (Matrix's Statement of Contested Facts within the Joint Pre-

Trial Order) at ¶ 3, 6; ROA 93 (Matrix's Post-Trial Findings of Fact) at ¶¶ 9, 10, 80, 81. The only citation which reflects a theory separate from the ITDLA theory was from Matrix's More Definite Statement of Facts in Support of its Equitable Subordination Defense. (*See* Appellant's 3/2/04 Reply Brief at 7, citing ROA 44, ¶ 32.) However, the theory Matrix asserted there was not a "trade usage" or "contract based" tool and die lien but rather a common law artisan's lien. The bankruptcy court did consider Matrix's separate common law artisan's lien theory, which we address in the next section. We find that Matrix has waived any claim for a trade usage or contract based tool and die or general processing lien. *See Morris v. Jenkins*, 819 F.2d 678, 681 (7th Cir. 1987) (holding that a theory raised for the first time on appeal is waived).

### D. Matrix's Asserted Common Law and Statutory Artisan/Repairman Lien

Matrix argues that the bankruptcy court erred when it concluded that Matrix did not have an artisan's lien and failed to award Matrix the reasonable value of its mold repairs. Matrix first argues that the bankruptcy court erred with respect to the burden of proof. Matrix complains that the bankruptcy court erred because its opinion contains no analysis of the superiority of the Bank's U.C.C. lien over Matrix's artisan's lien, for which the Bank has the burden of proof. The bankruptcy court's conclusion was that Matrix did not establish an artisan's lien by a preponderance of the evidence. This was premised upon its conclusion that Matrix failed to meet its burden in proving the existence of a repair contract upon which the artisan's lien would be based. As we previously recognized, the burden of proving that an item is subject to a security interest is on the party asserting that interest. *In re Standard Foundry Prods., Inc.*, 206 B.R. at 478. Thus, the bankruptcy court correctly placed the burden of proof as to the existence of an artisan's lien over the molds on Matrix. Having decided that Matrix did not have an artisan's lien because Matrix failed to meet its burden of proof as to that lien, it was not necessary for the bankruptcy court to analyze whether the Bank met its burden to prove the superiority

of its U.C.C. lien over Matrix's artisan's lien.  The bankruptcy court did not err.

Next, Matrix argues that the bankruptcy court erred when it failed to consider but concluded that Matrix did not have an artisan's lien based upon trade usage or statute.  Under Illinois law, possessory liens, like the artisan's lien, are fundamentally consensual in nature and can be created only by 1) agreement, 2) some fixed rule of law, or 3) usage of trade or commerce.  *Navistar Fin. Corp. v. Allen's Corner Garage and Towing Serv., Inc.*, 505 N.E.2d 1321, 1323 (Ill. App. Ct. 1987).  Thus, to establish the existence of the artisan's lien, Matrix had the burden of establishing a consensual relationship between the parties that Matrix would retain possession of the molds until all repair bills were paid under one of the three methods listed above.  The bankruptcy court held that Matrix had not met its burden of proving its lien under the first method, i.e. by agreement.  It held that Matrix did not establish it had a repair contract with Stylemaster that prevented Stylemaster from removing the molds from Matrix's possession until all repair bills were paid.  *Stylemaster I*, 296 B.R. at 472.  According to Matrix, the bankruptcy court's analysis, which focused on a contract based artisan's lien, ignored Matrix's theories under the second and third methods of showing a possessory artisan's lien, i.e. through trade usage or statute.  The Bank argues that Matrix did not raise either of these two theories during trial and thus has waived them.  Matrix contends that it did previously raise these trade usage and statutory based theories for an artisan's lien and directs us to several of its submissions at the trial level.  (*See* Appellant's 3/2/04 Reply Brief at 12 n.12, 13 (citing ROA 17 (Matrix's Statement of Additional Undisputed Facts in support of its Response and Objection to the Motion for Summary Judgment) at 7-9, 12-15, ROA 44 (Matrix's More Definite Statement of Facts in Support of its Equitable Subordination Defense) at ¶¶ 2-4, 32, 67; ROA 107 (Matrix's Statement of  Contested Facts within the Joint Pre-Trial Order) at ¶¶ 4 (including D. Exh. 8), 11-12; ROA 93 (Matrix's Post Trial Findings of Fact) at ¶¶ 10, 16-17, 27, 53-56, 79-81; ROA 16 (Memorandum in Support of its Cross-Motion for Summary Judgment) at ¶ 11, 28).)

With regard to its statutory based theory, specifically, Matrix's appeal asserts that the bankruptcy court ignored Matrix's artisan lien for cost of repairs based upon 770 Ill. Comp. Stat. 45/1, the Illinois Labor and Storage Lien Act. We have reviewed all of Matrix's citations to the record, and only one of them mentions this statute. (*See id.* at 12-13 (citing ROA 16 at ¶ 11).) However, Matrix's citation to the statute here was merely in response to the Bank's argument on summary judgment that the Illinois Tool and Die Act preempted the common law artisan's lien not an assertion of a lien under it.

Similarly, Matrix's citations to the record do not indicate that Matrix asserted an artisan's lien based on trade usage. Although a couple of the citations mention industry practice and trade usage, all of these simply concerned the practice and usage of whether a molder or mold owner is responsible for certain costs for mold repairs. Matrix never contended that there was a specific trade practice that molders would retain possession of a mold until all repair costs were paid. As the Bank correctly observed, Matrix in fact disavowed any theory that it had an artisan's lien based on trade usage at trial, relying instead on its alleged contract based theory. Wenk, Matrix's primary witness, testified that Matrix's agreement with Stylemaster concerning the payment of repairs and possession of the Molds was <u>contrary to</u> the custom and practice with other customers regarding repairs, which was to invoice for the cost of them, not to defer repair costs with a right to possess molds until they were paid. (*See* Tr. 1/14/03 at 152-154.) In sum, none of Matrix's citations indicates that Matrix asserted trade usage or statutory theories prior to this appeal. Although a few of these citations mention repairs that Matrix supposedly made, none of the citations discuss an artisan's lien for repair costs under any theory, and in fact, the majority of the citations concern Matrix's separately asserted statutory tool and die lien.

Even assuming that Matrix had properly raised its trade usage based artisan's lien at trial, the evidence Matrix directs us to in support of the theory does not establish that it met its burden of proof on it. Matrix states its evidence relating to the vast majority of restoration and debugging repairs it made

was "never disputed," and this evidence establishes the existence of its trade usage [and statutory based] artisan's liens.  (*See* Appellant's 12/24/03 Corrected Brief at 34.)  This does not establish that there was a usage within the industry that a molder could retain possession of  mold until its repair costs were fully paid.

Matrix next argues that the bankruptcy court erred when it concluded that the Bank's U.C.C. lien is superior to Matrix's contract based artisan's lien.  Matrix's argument here is curious because the bankruptcy court found that Matrix did not establish a contract based artisan's lien, so it did not, nor did it need to, make any conclusion about the superiority of the Bank's U.C.C. lien with respect Matrix's contract based artisan's lien.  To the extent that Matrix's argument is that the bankruptcy court erred by deciding it did not establish a contract based artisan's lien, we find that the bankruptcy court's decision was not erroneous.  At trial, Matrix asserted that it had a contract based artisan's lien based upon an alleged agreement between Matrix and Stylemaster that Matrix would defer repair bills for work that it did on Stylemaster molds, under which Matrix would keep track of repair costs and would retain possession of the molds until all repair bills were paid.  The bankruptcy court rejected Matrix's contract based artisan's lien because there was no documentation of the alleged agreement to defer repair costs and the only testimony of the alleged agreement was not credible as it was contradicted by other evidence and, in some instances, by the witness himself.  *Stylemaster I*, 296 B.R. at 473.

The remainder of Matrix's appeal on the artisan's lien concerns the bankruptcy court's determination that even assuming Matrix had established an agreement, it failed to establish the value of its repairs.  The bankruptcy court found that the evidence that Matrix submitted at trial regarding the value of its repair services to Stylemaster was not entitled to much credibility.  *Id.* at 473.  This was a separate reason for the bankruptcy court's conclusion that Matrix did not establish that it had an artisan's lien for the value of the repairs.  Matrix argues that the bankruptcy court improperly placed the burden

of proof on Matrix, rather than the Bank, arguing that once it clearly established that it made a repair for which costs were owed, the burden shifted to the Bank to show the costs asserted are speculative.

However, the authorities that Matrix cites in support of its position do not state this proposition. The cited authorities merely reflect the principle that proving absolute certainty as to the value of damages is not required for recovery; however, these authorities also recognize that the value of damages must be shown to at least a reasonable certainty and with a fair degree of probability. *See, e.g, SNA Nut Co. v. The Haagen-Dazs Co., Inc.*, 302 F.3d 725, 733 (7th Cir. 2002); *To-Am Equip. Co. v. Mitsubishi Caterpillar Forklift Am. Inc.*, 152 F.3d 658, 664 (7th Cir. 1998)*; Meyer v. Buckman*, 129 N.E.2d 603, 614 (Ill. App. 1955). To the extent this principle is applicable here, it is clear from the bankruptcy court's opinion that the evidence presented by Matrix did not establish the value of repairs to even a reasonable certainty. The bankruptcy court found that the evidence of repair costs presented by Matrix failed even "minimum standards of competency," as shown by the facts that significant portions of the evidence had been created in 2002 by a Matrix employee upon a questionable methodology; it was riddled with errors and inconsistencies; and it was not supported by documentation contemporaneous with the time repairs were allegedly made. *Stylemaster I*, 296 B.R. at 473. The bankruptcy court did not err with respect to this issue.

Matrix's remaining arguments on its artisan's lien basically contest the bankruptcy court's finding that Matrix's evidence as to the value of its repairs under the artisan's lien was not credible. Matrix directs us to various pieces of evidence which it believes show that its evidence of value should have been credited.[12] This conclusion was amply supported by the revelations during trial that significant

_____

[12]Matrix makes the specific argument that the bankruptcy court improperly used Matrix's failure to fully prove three individual repair costs to dismiss all of its repair costs. However, the bankruptcy court's opinion identified the problems with Matrix's evidence of value on three individual repair costs as an example of its overall concern with the process and documentation Matrix used to compute the value of its repairs. This was not in error.

portions of the evidence had been created in 2002 by a Matrix employee upon a questionable methodology, it was riddled with errors and inconsistencies, and it was not supported by documentation contemporaneous with the time repairs were allegedly made. *Stylemaster I*, 296 B.R. at 473. We do not believe that bankruptcy court's finding that Matrix's evidence failed to support the value of its alleged repairs was erroneous.

### E.  Matrix's Equitable Subordination Defense

Finally, Matrix appeals the bankruptcy court's decision to strike its eighth affirmative defense on equitable subordination. Although the bankruptcy court indicated to the parties in open court on December 20, 2002 that it would grant the Bank's motion to strike Matrix's equitable subordination defense and state its reasons in a written opinion, it never entered an order to this effect. (Tr. 12/20/02 18-19.) The bankruptcy court also indicated in its additional findings of fact and conclusions of law of January 13, 2005 that it prepared a memorandum opinion on the Bank's motion to strike the equitable subordination defense, and it appears that opinion was not docketed. *See Stylemaster III*, 319 B.R. at 555 n.2. We therefore remand this matter to the bankruptcy court for the limited purpose of entering the memorandum opinion and order on the Bank's motion to strike Matrix's equitable subordination defense. Once the bankruptcy court has issued that order and opinion, we will set a briefing schedule if one of the parties indicates that it wishes to appeal that order.

### CONCLUSION

For the reasons stated above, we affirm the bankruptcy court's findings of fact and conclusions of law of August 4, 2003, the challenged evidentiary and discovery rulings made upon the remand, and the additional findings of fact and conclusions of law of January 13, 2005. We remand this matter for

the limited purpose of allowing the bankruptcy court to enter its memorandum opinion and order on the Bank's motion to strike Matrix's equitable subordination defense.

It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated: 9/12/05